Richard A. Hearn (ISB No. 5574)
John J. Bulger (ISB No. 8375)
HEARN LAW, PLC
P.O. Box 70
155 S. 2nd Avenue
Pocatello, Idaho 83204
Telephone: (208) 904-0004
Facsimile: (208) 904-1816
Email: hearn@hearnlawyers.com
        bulger@hearnlawyers.com

Shane Reichert (ISB No. 8662)
Stratton Laggis (ISB No. 9414)
REICHERT LAGGIS PLLC
420 S. 4th Avenue
Pocatello, Idaho 83201
Telephone: (208) 232-4051
Facsimile: (208) 232-2880
Email: shane@rlidaholaw.com
        stratton@rlidaholaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHAYLEE WILLIAMSON,<br><br>    Plaintiff,<br><br>vs.<br><br>RALPH POWELL, individually; ERIC DAYLEY, individually; LEE EDGLEY, individually; BRADY BARNES, individually; PAUL GILBERT, individually; PAUL OLSEN, individually; MARCUS GRAHAM, individually; and TOM SELLERS, individually,<br><br>    Defendants. | Case No. 4: l9-cv-00099-BLW<br><br>**PLAINTIFF SHAYLEE WILLIAMSON'S *COMBINED* RESPONSE TO (1) DEFENDANTS OLSEN, GRAHAM AND SELLERS' MOTION FOR SUMMARY JUDGMENT [Dkt. 26] AND (2) DEFENDANTS EDGLEY, BARNES AND GILBERT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 35]** |

COMES NOW the Plaintiff, SHAYLEE WILLIAMSON, by and through attorney of record, John J. Bulger of the firm Hearn Law, PLC, and provides the following Response to Defendants Olsen, Graham and Sellers' Motion for Summary Judgment [Dkt. 26] and Defendants Edgley, Barnes and Gilbert's Motion for Summary Judgement [Dkt. 35].

## INTRODUCTION

In this Memorandum of Law, Plaintiff Shaylee Williamson ("*Williamson*") responds to the arguments presented in (1) Defendants Olsen, Graham and Sellers' Memorandum in Support of Motion for Summary Judgment (Dkt 26-2) ("*Summary Judgment Brief for Non-Shooters*") and (2) Memorandum in Support of Summary Judgment As To Defendants' Lee Edgley, Brady Barnes and Paul Gilbert (Dkt 35-2) ("*Summary Judgment Brief for Shooters*").[1]

Based upon alleged "Facts Not in Dispute,"[2] Defendants Olsen, Graham and Sellers argue that, because they never fired their weapons, they should be entitled to summary judgment. In Section 1 of the Summary Judgment Brief for Non-Shooters, Defendants Olsen, Graham and Sellers claim that -- because their "actions did not constitute 'integral participation' in a constitutional violation – they should be entitled to summary judgment.[3] In Section 2 of the Summary Judgment Brief for Non-Shooters, Defendants Olsen, Graham and Sellers claim that – because Williamson "cannot establish ISP non-firing Defendants' liability under a 'failure to intercede' theory – they should be entitled to summary judgment.[4]

---

[1] Williamson responds to the arguments presented in the Summary Judgment Brief for the Non-Shooters (Defendants Olsen, Graham and Sellers) in Sections D, E, F and G below and responds to arguments in the Summary Judgment Brief for the Shooters (Defendants Edgley, Barnes and Gilbert) in Sections A, B and C below.

[2] Williamson disputes many of Defendant's alleged "Facts Not in Dispute" including, but not limited to, Defendants' claim that Defendant Edgley was struck by Chacon's car. *See Williamson's Statement of Facts*, ¶ 37.

[3] See Summary Judgment Brief for Non-Shooters, pp 8-10.

[4] See Summary Judgment Brief for Non-Shooters, p 11.

But, as discussed in Section D and E below, Defendants Olsen, Graham and Sellers wrongly assume that the only constitutional violation at issue here is the shooting of Williamson by one or more of the shooters, *i.e.*, Defendants Edgley, Barnes and Gilbert. Defendants Olsen, Graham and Sellers' motion for summary judgment should be denied because – prior to any shots being fired – each of these Defendants was an "integral part" of the seizure of Williamson in violation of the Fourth Amendment and each of these Defendants failed "to intercede" to prevent the planned unconstitutional seizure of Williamson. Furthermore, Defendants planned seizure of Williamson by plain clothes detectives driving unmarked vehicles at gun point was not only unreasonable, but proximately caused the subsequent shooting of Williamson.

In Section 3 of the Summary Judgment Brief for Non-Shooters, Defendants Olsen, Graham and Sellers claim that -- because they are entitled to qualified immunity – they should be entitled to summary judgment. But Defendants Olsen, Graham and Sellers qualified immunity argument based upon the *Fourteenth Amendment* fails because all of Williamson's Constitutional claims arise under the *Fourth Amendment*.[5]

Finally, in Section 4 of the Summary Judgment Brief for Non-Shooters, Defendants Olsen, Graham and Sellers claim that the tort of negligent planning does not exist. As discussed in Section F below, Defendants are incorrect.

Based upon alleged "Facts Not in Dispute,"[6] Defendants Edgley, Barnes and Gilbert argue that, even though they did fire their weapons, they should be entitled to summary judgment. In Section 1 of the Summary Judgment Brief for Shooters, Defendants Edgley, Barnes and Gilbert

---

[5] *See* discussion of the differences between *Fourth Amendment* and *Fourteenth Amendment* claims against police officers in Section A below.

[6] Williamson disputes many of Defendant's alleged "Facts Not in Dispute" including, but not limited to, Defendants' claim that Defendant Edgley was struck by Chacon's car. *See Williamson's Statement of Facts*, ¶¶ 37, 38.

claim that – because the shooting is subject to *Fourteenth Amendment* rather than *Fourth Amendment* analysis – they should be entitled to summary judgment.[7] In Section 2 of the Summary Judgment Brief for Shooters, Defendants Edgley, Barnes and Gilbert claim that – even if Williamson's claims do arise under the *Fourth Amendment* – they should be entitled to summary judgment. And finally, Defendants Edgley, Barnes and Gilbert argue that Williamson's claims for negligent planning are not viable in Section 3 of the Summary Judgment Brief for Shooters.

But, as discussed in Sections A and B below, the claims against Defendants Edgley, Barnes and Gilbert as well as the other three Non-Shooter Defendants must be analyzed under the *Fourth Amendment*. Williamson was not just some innocent bystander incidentally injured by police during the arrest of a suspect, but instead, Williamson was a passenger in a car intentionally seized by plain clothes police without probable cause using a "box-in" and "rush and grab" maneuver with guns drawn. "But for" this "unreasonable" seizure of Williamson in violation of the *Fourth Amendment*, Williamson would never have been shot.

Again, in Section 3 of the Summary Judgment Brief for Shooters, Defendants claim that the tort of "negligent planning" does not exist. As discussed in Section C below, Defendants Edgley, Barnes and Gilbert are incorrect.

## I.    STATEMENT OF FACTS

On the morning of March 27, 2017, Defendants Barnes and Graham were alerted to the possible whereabouts of Rocco Chacon at a home in Pocatello.[8] Chacon, who had two outstanding warrants for probation violations, had slipped away from an Idaho State Police patrolman approximately one month prior during a routine traffic stop.[9] Defendants communicated, and

---

[7] See Summary Judgment Brief for Shooters, pp 5-12.
[8] Statement of Facts ¶ 5.
[9] Statement of Facts ¶¶ 3, 4.

PLAINTIFF SHAYLEE WILLIAMSON'S *COMBINED* RESPONSE TO (1) DEFENDANTS OLSEN, GRAHAM AND SELLERS' MOTION FOR SUMMARY JUDGMENT [DKT 26] AND (2) DEFENDANTS EDGLEY, BARNES AND GILBERT'S MOTION FOR SUMMARY JUDGMENT [DKT 35] – Page 4

Defendant Olsen drove to the site where Chacon was purported to be staying.[10] Olsen corroborated that Chacon was present in a residence on Saratoga.[11]  The Defendants all then drove to the area.[12] Thereafter, Olsen and Barnes began to formulate a plan to apprehend Chacon.[13]  They settled upon a plan employing themselves and Gilbert, Graham, Sellers and Edgley, wherein Chacon's vehicle would be boxed in with vehicles if and when he approached the intersection of Olympus Avenue, a main thoroughfare in Pocatello. Once stopped, the officers would employ a "rush and grab" to arrest Chacon.[14]

Olsen relayed information from his vantage, letting the officers know that Chacon had exited from the home with an unidentified female and gotten into his vehicle.[15]  No discussion ensued about altering or aborting the plan due to the woman's presence.[16]  Chacon drove away and took the route officers hoped he would to the intersection of Olympus Drive.[17]  Due to timing issues, the original plan was altered on the fly via radio as to vehicle positioning, with Edgley taking the lead and stopping at the intersection in front of Chacon's vehicle.[18]  The original plan had called for the lead car to stop short in order to use parked vehicles to block any potential escape route on the right.[19]  It is undisputed that Edgley's truck stopped too far forward to use the parked vehicles to block the Honda's right side.

---

[10] Statement of Facts ¶ 6.
[11] Statement of Facts ¶ 18.
[12] Statement of Facts ¶ 11.
[13] Statement of Facts ¶ 15.
[14] Statement of Facts ¶ 14.
[15] Statement of Facts ¶ 20.
[16] Statement of Facts ¶ 21.
[17] Statement of Facts ¶ 26.
[18] Statement of Facts ¶¶ 16, 17.
[19] Statement of Facts ¶ 16.

Edgley exited his vehicle and positioned himself directly in front of the driver of the vehicle.[20] Edgley had no visible markings that identified him as law enforcement, and he did not identify himself as law enforcement.[21] Chacon's primary focus was on Edgley.[22]  It was his belief that a robbery was occurring.[23] Chacon testified that, fearing for his and Williamson's lives, he let off the brake of his manual vehicle and his car drifted backwards.

Q. Okay. When you put the car in neutral, did the car do anything?

A. Yes, it - so you have - if you have neutral, your car rolls back, you know what I mean, and that's in my head, so I didn't have to put it in reverse to move my car back. It rolled back and angled more towards the right, and I turned my wheels. I was - so putting the car -and at the same time, I'm turning my wheels, you know what I'm saying, to go right.[24]

Defendant Graham's testimony describes Edgley on the move when Chacon's vehicle backed up and turned.[25] Chacon testified that it was his intent to drive around to the right between Edgley's truck and that he did not perceive anyone in his path.

Q. So once you angle your wheel, what happens?

A. You know, I just want to say it happened really fast. After I angled my wheel, I remember seeing the individual in my peripheral to my left, and he wasn't in my line of sight at  the time. I remember seeing him in my peripheral vision, and as I turned my wheel, I go, and I just  remember - this is what I remember. So I remember it looked like the individual was running with my car or either lunged on it or jumped on it. That's what I - that's what I – I didn't see it, but it was in my peripheral vision. That's the best way I can explain it. And when he was doing that, there was just shots fired.[26]

---

[20] Statement of Facts ¶ 34.
[21] Statement of Facts ¶ 32.
[22] Statement of Facts ¶ 35.
[23] Statement of Facts ¶ 29.
[24] Id., 782:14-24.
[25] Statement of Facts ¶ 54.
[26] Id., 783:10-21.

Edgley discharged his weapon an unknown number of times while on the hood and fired additional rounds after rolling off the vehicle hood to the ground.[27] Defendant Gilbert testified that he shot the vehicle's tire first,[28] and then once Edgley was clear, fired at the vehicle.[29] Defendant Barnes' position was next to Gilbert.[30] He did not announce himself as a police officer or hear anyone else do so.[31] As the vehicle was going around Edgley's truck, Barnes fired one shot through the back window.[32]

After clearing Edgley's truck, Chacon drove between the vehicle and the fence.  Defendant Olsen described Chacon's vehicle's speed as slow, perhaps one mile per hour.[33]

After a chase, the vehicle was stopped and Chacon was taken into custody. Williamson was transported to the hospital with serious wounds.  Williamson was shot at least two times and possibly three, sustaining injuries to her hand, arm and one bullet lodging in her liver, where it remains.[34]  No charges were brought against her.

Mr. Chacon, who was unharmed, was tried in Bannock County in January 2019 on various felony counts including battery with intent to commit murder on certain personnel, aggravated battery on certain personnel, and aggravated battery. He was acquitted on all battery counts.[35]

Edgley was subject to discipline for failing to properly identify himself as law enforcement during the stop of Chacon.  The third level review was authored by Capt. Fritz Zweigart, who sustained the violation of the ISP Procedure 06.15 – Use of Force.  Zweigart also stated:

---

[27] Statement of Facts ¶ 40.
[28] Statement of Facts ¶ 51.
[29] Statement of Facts ¶ 52.
[30] Statement of Facts, ¶ 43.
[31] Statement of Facts ¶ 44.
[32] Statement of Facts ¶ 45.
[33] Statement of Facts, ¶ 38.
[34] Statement of Facts ¶¶ 59, 60.
[35] Chacon trial, 1060:1-14.

I believe Detective Edgley put himself and the other detectives in a very dangerous position of crossfire by exiting his vehicle and going to the front of the suspects' vehicle with other detectives at the side and rear of the suspects' vehicle. Detective Gilbert stated at one point he heard something go by his head, unknown if that was a bullet or not. The other part of Detective Edgley's decision that alarms me is when Detective Edgley stated he exited his vehicle and stood between his vehicle and the suspects' front driver's side headlight. **It is confusing to me how Detective Edgley got hit being in that position when the suspect was veering to the right to exit the scene and avoid Detective Edgley's vehicle.** Detective Edgley put himself in a very dangerous and untactful position.[36] (Emphasis added.)

## II.    ARGUMENT

### A. Whether Defendants Edgley, Barnes and Gilbert ("Shooters") Violated Williamson's Right to Be Free from an Unreasonable Seizure Must Be Analyzed under the Fourth Amendment.

Defendants argue that Williamson was a bystander, and not the object of the vehicle stop or the shooting. They assert that *Fourth Amendment* claims are therefore foreclosed and that the Fourteenth Amendment is the proper focus.

This argument was raised by defendants in *Villaneuva v. California*, 2019 U.S. Dist. LEXIS 65031, decided Jan. 31, 2019.  In *Villaneuva,* the defendants, law enforcement officers, claimed to believe that a suspect's vehicle was about to run over one of the officers.  The vehicle did not come in contact with the officer.  Nonetheless, officers opened fire and shot both the driver and the passenger.  The driver, Villaneuva, died from his gunshot injuries.  Officers claimed that they were unaware of the passenger, Orozco, who was severely wounded.  The officers moved for summary judgment, contending Orozco could not assert a Fourth Amendment excessive force claim because Orozco was not the object of the use of force and was not "seized."

---

[36] Statement of Facts ¶ 62.

The Court,  citing *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007), ruled that apprehension by deadly force constitutes a seizure under the Fourth Amendment and that both a driver and a passenger are seized when police stop a car:

> A person is "seized" under the Fourth Amendment "when [an] officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." [37] **Both the driver and passenger of a car are seized when police stop a car, and "an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act."** *Id.* at 251, 254. The Supreme Court in *Brendlin* held that what matters in determining whether a seizure has occurred is the "**intent [that] has been conveyed to the person confronted," not the "subjective intent" of the officer.** *See Brendlin, 551 U.S. at 260-61.* In *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989), the Court held that the plaintiff was seized when the car he was driving crashed into a roadblock officers had set to stop him. *Id.* at 599. *Brendlin* explained that "if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock," **rejecting the defendant's argument that "for a specific occupant of the car to be seized he must be the motivating target of an officer's show of authority."** 551 U.S. at 261. Thus, Orozco argues that, applying *Brendlin*, it does not matter if Villanueva was the "motivating target" of Henderson and Cleveland's show of force. (Cite omitted). Instead, when Henderson and Cleveland intentionally stopped Villanueva's truck, they seized everyone inside the truck, including Orozco. [38] (Emphasis added).

Similarly, Williamson was "seized" when the officers boxed in the car she was in, even though she was not the "motivating target" of the stop.

The *Villaneuva* Court noted the Ninth Circuit had not yet addressed in a published decision the issue whether a passenger in a shooting may recover under a *Fourth Amendment* theory.  The Court declined to follow the case cited by Defendants, *Fletes v. City of San Diego*, 2015 WL 13326240 (S.D. Cal. Sep. 30, 2015). The *Fletes* Court found on summary judgment that the passenger was not seized because the officer who knew the passenger was in the car shot only the

---

[37] *Brendlin* at  551 U.S. at 254, 127 S. Ct. 2400 at 168.
[38] *Villeneuva,* \* 14-15.

driver, and other two officers were unaware of the passenger's presence. The Court noted that *Fletes* was "factually indistinguishable from Orozco's shooting — officers shot at the driver of a car fearing that he would run them over and hit the passenger as well."[39] The court declined to follow the *Fletes* Court's reasoning, citing *Brendlin* as the basis. The Court adopted the holding in *Davenport v. Borough of Homestead, 870 F.3d 273 (3d Cir. 2017)*, where it was noted that "the majority of circuits have suggested that a passenger . . . may seek relief under the Fourth Amendment." *Id.* at 279 (collecting cases). Further, "those circuits that have suggested otherwise reached their decisions on this issue before the Supreme Court decided *Brendlin*."*Id.*

Defendants further rely upon a case published a few months after *Villeneuva, M.J.L.H. v. City of Pasadena*, No. CV 18-3249-JFW(SSx), 2019 U.S. Dist. LEXIS 88077 (C.D. Cal. May 24, 2019), That case, however, is factually distinguishable from the instant case. In *M.J.L.H.,* law enforcement was on alert for a suspect in an attempted double homicide.  Officers were informed of the suspect's past, which included arrests for carjacking, robbery, assault with a deadly weapon, and battery with serious bodily injury.  They knew the suspect was a gang member, and that he was believed to be armed with one and possibly two semi-automatic weapons. The suspect and an unknown woman got into a vehicle and were quickly surrounded by unmarked cars with their lights and sirens activated.  Officers identified themselves as police and wore plainly visible vests with the word "POLICE" on them.  The suspect revved his vehicle at full throttle with tires squealing and smoking and drove backwards and forwards, repeatedly striking an officer's vehicle repeatedly. When the suspect was observed reaching for the middle console, officers yelled, "he's reaching" and opened fire.  The suspect was killed and his passenger was wounded.

---

[39] Here, Defendants have cited *Fletes* as virtually identical to the instant facts.

The Court found that, given all of the facts known to the officers and what had occurred during the encounter, even viewed in a light most favorable to the plaintiffs, the officers had probable cause to believe that the decedent posed immediate threat of seriously bodily injury or death to themselves, their fellow officers, and the public. The Court found the officers did not violate the Fourth Amendment rights of either the decedent or the passenger by excessive force.

The *M.J.L.H.* Court, in adopting the reasoning in *Fletes*, failed to address *Brendlin* at all. Nor does it reference *Villenueva, o*r another recent Ninth Circuit case, *Lerma-Mayoral v. City of El Centro,* Case No.: 15cv818-LAB (PCL), 2018 U.S. Dist. LEXIS 162117, 2018 WL 4537752, (S.D. Cal. Sept. 21, 2018) which found that a taxi driver was "seized" when his taxi was stopped and the suspect passenger was fatally shot. The court held:

> Lerma-Mayoral points out that, by pulling over and surrounding the taxi, pointing their guns, and shooting, the officers effected a seizure, not only of the passenger, but also of the driver. *See Brendlin v. California*, 551 U.S. 249, 254-56, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). Peraza has cited a number of decisions suggesting that incidental restraint of hostages or bystanders should be analyzed under the Fourteenth rather than the Fourth Amendment. **But after *Brendlin* it is questionable whether these are still good law**. Several Circuits, but not the Ninth, have held that when officers attempt to seize one person in a vehicle, they are not effecting a seizure (within the meaning of the Fourth Amendment) of other occupants of the vehicle for § 1983 purposes. *See Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (citing and discussing cases), *cert. denied sub nom. Davenport v. Borough of Homestead, Pa.*, 138 S. Ct. 1263, 200 L. Ed. 2d 417 (2018). It is not clear whether *Brendlin* has effectively overruled these. *Id. See also Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 2022, 188 L. Ed. 2d 1056 (2014) (declining to express a view on this question). **But in any event, decisions since *Brendlin* have examined officers' behavior under the Fourth Amendment.** *Davenport*, 870 F.3d at 279. Although other courts have taken a different approach, *see, e.g., Nakagawa v. Cty. of Maui*, 2014 U.S. Dist. LEXIS 37901, 2014 WL 1213558 at *5-*6 (D. Haw. Mar. 21, 2014), the Court agrees with the Third Circuit's analysis. Furthermore, **to the extent Lerma-Mayoral's claims are premised on an excessive force theory, this is consistent with *Graham*'s holding that all claims of excessive force in the course of an investigatory stop should be analyzed under the Fourth**

**Amendment's "reasonableness" standard rather than the Fourteenth Amendment.** 490 U.S. at 394-95.[40] (Emphasis added).

Because the cases relied upon by Defendants failure to analyze – or even reference – *Brendlin*, this Court should adopt the holdings in *Villaneuva* and *Lerma-Mayoral* and find that Williamson has standing to pursue a *Fourth Amendment* excessive force claim stemming from her unlawful seizure.

"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen," *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968); *see Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)."[41]

There should be little to no dispute as to whether Williamson should be considered to have been "seized" for *Fourth Amendment* purposes when Defendants Edgley, Barnes, Gilbert, Olsen, Graham and Sellers – knowing that there was an unidentified woman in Chacon's car – executed their plan to apprehend Chacon using a "box-in" and "rush and grab" maneuver. Under these circumstances, Williamson's liberty was clearly restrained by "physical force or a show of authority."[42]

For a seizure to have occurred for *Fourth Amendment* purposes, Defendants must have been acting "intentionally" or "willfully" when seizing Williamson. In *Brower v. County of Inyo*, the U.S. Supreme Court held that, under the *Fourth Amendment*, a seizure occurs even if the person detained was not the person the police intended to detain.

Violation of the *Fourth Amendment* requires an intentional acquisition of physical control. **A seizure occurs even when an unintended person or thing is the object**

---

[40] *Lerma-Mayoral at* 17-18.
[41] *Graham v. Conner*, 490 U.S. 386, 395 n.10 (1989).
[42] *Graham v. Conner*, 490 U.S. 386, 395 n.10 (1989).

> **of the detention or taking,** *see Hill v. California*, 401 U.S. 797, 802-805 (1971); cf. *Maryland v. Garrison*, 480 U.S. 79, 85-89 (1987), **but the detention or taking itself must be willful.** This is implicit in the word "seizure," which can hardly be applied to an unknowing act.[43]

As such, the fact that Defendants were not intending to seize Williamson's person when they intentionally seized the "unknown female" using the "box-in" and "rush and grab" maneuver when attempting to seize Chacon is unimportant for *Fourth Amendment* purposes.

Because Defendants were carrying out a previously agreed upon plan to "box-in" Chacon and Williamson's vehicle, there can be no dispute as to whether these Defendants were acting "willfully" when seizing Williamson.

> A person acts "intentionally" when the person acts with a conscious objective to engage in particular conduct. This, the plaintiff must prove the defendant meant to engage in the act[s] that caused a seizure of the plaintiff's person. Although the plaintiff does not need to prove the defendant intended to violate the plaintiff's Fourth Amendment rights, it is not if the plaintiff proves the defendants acted negligently, accidentally in conducting the search"[44]

The "particular conduct" that was the "conscious objective" of Defendants Edgley, Barnes, Gilbert, Olsen, Graham and Sellers was the seizing of the occupants of Chacon's car using the preplanned "box-in" and "rush and grab" maneuver.

The fact that Williamson – as an "unidentified female" passenger in Chacon's car – was not the "motivating target" of the Defendants' plan to "box-in" Chacon's car does not mean that she was not entitled to the full protection of the *Fourth Amendment*. In *Brendlin v. California*, 551 U.S. 249, 260-261, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007), the Court held that what matters in determining whether a seizure has occurred is the intent conveyed to the person confronted – Williamson in this case – and not the subjective intent of the officers.

> **Both the driver and passenger of a car are seized when police stop a car**, and **"an unintended person may be the object of the detention, so long as the**

---

[43] *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).

[44] *Brower*, 489 U.S. at 596-97.

**detention is willful and not merely the consequence of an unknowing act."** *Id.* at 251, 254 (*alterations and quotation marks omitted*). The Supreme Court in *Brendlin* held that what matters in determining whether a seizure has occurred is the "intent [that] has been conveyed to the person confronted," not the "subjective intent" of the officer. *See Brendlin*, 551 U.S. at 260-61. In *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989), the Court held that the plaintiff was seized when the car he was driving crashed into a roadblock officers had set to stop him. *Id.* at 599. *Brendlin* explained that "if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock," rejecting the defendant's argument that "for a specific occupant of the car to be seized he must be the motivating target of an officer's show of authority." 551 U.S. at 261.[45]

Both Chacon and Williamson were seized when Defendants executed their plan to apprehend Chacon by using a "box-in" and "rush and grab" maneuver.

Even if this Court were to determine that Williamson's excessive force claim should be evaluated under the *Fourteenth Amendment*, summary judgment should still be denied. The appropriate standard for liability on a *Fourteenth Amendment* claim in a given case turns on whether the officer had an opportunity for actual deliberation. *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 698 (E.D. Cal. 2019).

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.[46]

Here, Edgley had time to deliberate whether to remain where he stood or move into the path of the vehicle. He had time to warn the occupants of any intention to shoot. It "shocks the conscious" for an unidentified officer to exit from an unidentified vehicle stopped directly in front of the car, and thereafter employ deadly force by firing multiple shots at a vehicle's occupants –

---

[45] *Villanueva v. State*, 2019 U.S. Dist. LEXIS 65031 **14-15, 2019 WL 1581392 (C.D. Cal. January 31, 2019) (*emphasis added*).

[46] Gantt v. City of Los Angeles, 717 F.3d 702, 707 (9th Cir. 2013)

PLAINTIFF SHAYLEE WILLIAMSON'S *COMBINED* RESPONSE TO (1) DEFENDANTS OLSEN, GRAHAM AND SELLERS' MOTION FOR SUMMARY JUDGMENT [DKT 26] AND (2) DEFENDANTS EDGLEY, BARNES AND GILBERT'S MOTION FOR SUMMARY JUDGMENT [DKT 35] – Page 14

at least one of whom has their hands up – after purposely jumping or lunging onto the hood. It further "shocks the conscience" where officers, aware that their fellow officer is out of harm's way and that the slowly-moving car is not portending a threat to anyone, shoot at the occupants indiscriminately. No warning was ever made by any officer that shots were to be fired. These actions and omissions show deliberate indifference or a reckless disregard for Williamson's rights.

Even if this Court were to apply the "purpose to harm" standard, Plaintiff's claim would still survive because under Plaintiff's facts, the officers had no legitimate law enforcement purpose in shooting at the Honda and its occupants because no officer was endangered by it immediately prior to and during the shots. The officers were aware of Williamson's presence, but discounted it throughout the encounter. Where the facts regarding practical deliberation are disputed, only the jury can determine which of the two "shocks the conscience" standards apply.[47]

## B. Defendants Edgley, Barnes and Gilbert ("*Shooters*") Violated Williamson's *Fourth Amendment* Right to Be Free from an Unreasonable Seizure.

Obviously, not all seizures are found to be "unreasonable" and therefore in violation of the *Fourth Amendment*. But police stops that are full-scale arrests are seizures and must be supported by probable cause. In *Morgan v. Woessner*, the Ninth Circuit explained that "stops" under the *Fourth Amendment* fall into three categories:

> First police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures. Second, the police may "seize" citizens for brief, investigatory stops. This class of stops is nonconsensual, and such stops must be supported by "reasonable suspicion." Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probably cause.[48]

---

[47] *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. 2017)
[48] *Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993).

Because the Defendants' "stop" of the "unknown female" in the car with Chacon was neither consensual nor a brief investigatory stop supported by "reasonable suspicion," it should be treated as a "full-scale arrest . . . [which] must be supported by probable cause."[49] But, because Defendants were unaware of the identity of the female in Chacon's car, the Defendants lacked probable cause to justify seizing Williamson as they did. All Defendants knew at the time of her seizure was that she was observed getting into a car with Chacon. This fact alone should make Williamson's seizure by Defendants unreasonable and therefore a violation of the *Fourth Amendment*.

Determining whether the seizure of Williamson was reasonable requires balancing the nature of the intrusion on Williamson's liberty against the countervailing governmental interests of the Defendants in arresting Chacon.

> "A *Fourth Amendment* claim of excessive force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*. "*Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (*en banc*). Under *Graham*, "all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' . . . should be analyzed under the *Fourth Amendment* and its 'reasonableness' standard." 490 U.S. at 395. **This analysis "requires balancing the 'nature and quality of the intrusion' on a person's liberty with the 'countervailing governmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances."** *Smith*, 394 F.3d at 701.[50]

While the "countervailing governmental interest" in arresting Chacon remained constant from the moment Chacon was observed coming out of the house and getting into a car with an unidentified female, the "nature and quality of the intrusion" on Williamson's liberty increased from initially just being seized by Defendants Edgely, Barnes, Gilbert, Olsen, Graham and Sellers

---

[49] *Id.*

[50] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053-1054 (9th Cir. 2007) (*emphasis added*).

without probable cause to eventually being shot *without warning* by one or more of the three

Defendants who fired into the car.[51]

> Thus, "[w]e first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001). Factors we consider in assessing the government interests at stake include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. **Courts may also consider "the availability of alternative methods of capturing or subduing a suspect."** *Smith*, 394 F.3d at 701.[52]

The *Graham* factors to be consider in assessing the governmental interests at stake in

Williamson are as follows. First, at the time of Williamson's seizure, the only crime at issue was

Chacon's bench warrant for probation violations. Defendants were unaware of any crime ever

being committed by the "unidentified female" who subsequently was identified as Williamson.

Second, when Defendants executed their plan to seize both Chacon and Williamson using a "box-

in" maneuver, neither Chacon nor Williamson posed any threat to the Defendants or others. And

finally, neither Chacon nor Williamson were actively resisting arrest or attempting to evade

capture until Defendants had already seized them both at gun point. In fact, at the time she was

shot by one or more Defendants, Williamson was sitting in Chacon's car with her hands up.[53]

As held in *Smith v. Hemet*, this Court may consider one additional factor when deciding

whether Williamson's seizure by Defendants was reasonable. "As we have previously explained,

an additional factor that we may consider in our *Graham* analysis is the availability of alternative

---

[51] *Lopez v. City of Imperial*, 2015 U.S. Dist. LEXIS 87441 *45 (S.D. Cal. July 2, 2015) ("[T]he absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation." *Gravelet-Blondin*, 728 F.3d at 1092 (*citing Mattos*, 661 F.3d at 451; *Deorle*, 272 F.3d at 1283-84).

[52] *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (*emphasis added*).

[53] Statement of Facts, ¶ 26.

PLAINTIFF SHAYLEE WILLIAMSON'S *COMBINED* RESPONSE TO (1) DEFENDANTS OLSEN, GRAHAM AND SELLERS' MOTION FOR SUMMARY JUDGMENT [DKT 26] AND (2) DEFENDANTS EDGLEY, BARNES AND GILBERT'S MOTION FOR SUMMARY JUDGMENT [DKT 35] – Page 17

methods of capturing or subduing a suspect."[54] Here, the Defendants should have considered whether there were alternative methods of capturing Chacon that would not have proximately caused the seizure and shooting of Williamson in violation of the *Fourth Amendment*.

### C. When Attempting to Arrest Chacon, Defendants Edgley, Barnes and Gilbert ("*Shooters*") Breached their Duties as Idaho State Police Officers to Williamson.

Idaho State Police Policy clearly outlines what actions must be taken by officers when effecting "planned arrests" or "warrant services." Pursuant to policy, a "planned arrest" is the "formulated beforehand taking of a person into custody in a case and in a manner authorized by law. A "warrant service" is "the legal act of complying with a written order from a magistrate commanding an officer to arrest a defendant…."[55] Under these definitions, the apprehension of Chacon was a "planned arrest" premised upon a "warrant service," i.e., the written order of a magistrate in the form of a bench warrant for probation violation.

The Idaho State Police "requires officers to utilize the operation planning, threat assessment/risk mitigation process format" which "**must** be completed for all planned arrests and warrant service."[56] (Emphasis added.)

The mandatory operation planning/threat assessment/risk mitigation process employs an analysis to determine the risk classification:

> When the risk determines the operation to be classified as moderate, high and extremely high-risk, as in any planned arrest, warrant service, or any time an operation increases the likelihood of injury to personal or damage to property, the assigned case officer completes the EHF 0 14-02 Threat Assessment Plan.[57]

---

[54] *Smith v. Hemet*, 394 F.3d 689, 703 (9th Circuit 2005).
[55] Affidavit of John J. Bulger, ¶ 4.
[56] Id.
[57] Id., at C.2, Operation Planning, Threat Assessment/Risk Mitigation Process.

After the plan is filled out and the risk is assessed by a point factor, an operation plan is to be developed and the ISP Criminal Intelligence Center or district analyst are required to be contacted. The overall risk level then determines the level of authorization required.[58]

It is undisputed that no such plan was ever filled out in this case. Barnes was perceived as the case officer.[59] It is the case officer's duty to identify hazards via a threat assessment worksheet and thereafter determine if the risk level is moderate, high, or extremely high. Although Barnes did not fill out the worksheet, he identified the risk level in as "high" in performing the box-in maneuver and rush and grab of Chacon.[60] A high risk operation requires the approval of a lieutenant, captain or higher.[61] While the case officer is tasked with completing the worksheet, "[t]hreat assessment and risk mitigation are the responsibility of everyone involved in the operation."[62] (Emphasis added.)

It is undisputed that no Defendant ever voiced concern with the plan to box-in and rush and grab Chacon after the "unidentified woman" entered the picture. All officers, including Graham, Olsen and Sellers, were in breach of their duties when they failed to raise any concern with the plan that included the unwarranted and illegal seizure of Williamson as part of the apprehension of Chacon.

Defendants' conduct was negligent under Idaho law. In *Kessler v. Barowsky*, 129 Idaho 640, 931 P.2d 634 (1996), a planned arrest by five officers of a reserve deputy went awry, culminating in the officers firing multiple rounds and killing the deputy. Various claims, including negligent planning and negligent execution were asserted, and the Defendants moved for summary

---

[58] Id.
[59] Statement of Facts ¶ 23.
[60] Statement of Facts, ¶ 24.
[61] Bulger Affidavit, Operation Planning, Threat Assessment/Risk Mitigation Process.
[62] Id.

judgment.  The court granted summary judgment, dismissing the negligence claims. On appeal,

the Idaho Supreme Court ruled the lower court had erred by dismissing the negligent planning and

negligent execution of an arrest claims.  The Court stated:

> Construing the totality of the evidence most favorably to Lenore leads to conflicting
> inferences concerning whether the officers should have known that Bobbie would
> react defensively after being sprayed with Cap-stun, become disoriented, use his
> weapon to defend himself, and be killed as a result. A reasonable person might
> conclude that the officers should have anticipated this result. Therefore, there are
> genuine issues of material fact concerning whether the plan called for the use of
> excessive force and whether the execution of the plan caused Bobbie's death.[63]

In seeking summary judgment on Williamson's state law claims, Defendants fail to acknowledge

– much less analyze –  the law as set forth in *Kessler v. Barowsky.*

Here, officers ultimately ignored the presence of Williamson and proceeded with their plan

to box in, which went horribly awry, in part because the box-in was botched, allowing for an escape

route for the Honda to the driver's right.  Rather than submit operation planning and determine the

risk level, with review by a senior officer, the Defendants quickly moved forward with their

unvetted plan, with no one heard to question it.

Further, there was no exigency to the planned seizure of Chacon. Although Chacon had

fled by foot from an ISP patrol one month earlier, his offenses were probation violations.

When attempting to perform the seizure of Chacon, the Defendants did not present

themselves as readily identifiable police officers.  Rather, they boxed the car in with unmarked

vehicles. Chacon was fleeing the individuals, but not because he understood them to be police, but

because he believed he was about to be robbed.[64]  This embodied the concern highlighted in ISP

policy about stops by unmarked vehicles:

---

[63] *Kessler* at 655.

[64] Statement of Facts, ¶ 29.

PLAINTIFF SHAYLEE WILLIAMSON'S *COMBINED* RESPONSE TO (1) DEFENDANTS OLSEN, GRAHAM
AND SELLERS' MOTION FOR SUMMARY JUDGMENT [DKT 26] AND (2) DEFENDANTS EDGLEY,
BARNES AND GILBERT'S MOTION FOR SUMMARY JUDGMENT [DKT 35] – Page 20

The detective will learn other options to stop vehicles such as asking uniformed officers to assist, if necessary. The FTO and detective should discuss circumstances that justify the stopping of persons in vehicles and the ramifications of readily identifying "unmarked" vehicles by the display of emergency lights that are also used in covert surveillances. The detective should understand that unmarked vehicles do not have the "highly visible" police presence and the public reacts differently them, especially in traffic situations.[65]

This mistake of their identity was further spurred by the officers' execution of the seizure. They rushed the Honda with guns drawn and shouting for the occupants to "get the fuck out of the car," and with an individual front and center with no identifiable markings pointing his gun at them. Then, when the vehicle started to move to get away from the unknown and menacing individuals, no warning was ever given to its occupants that shooting would commence.  Defendants should not be shielded from their negligence in the planning and execution of the seizure of Chacon and Williamson.

Defendants assert that Williamson cannot make out a viable claim for infliction of emotional distress, either negligently or intentionally.  Defendants are incorrect. The elements for negligent infliction of emotional distress are: (1) a duty recognized by law requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the conduct and the plaintiff's injury; and (4) actual loss or damage.[66]

First, as noted above, Defendants had a duty to not formulate a plan of arrest in a negligent manner. They breached that duty.  "But for" the failure to amend or abandon their plan to perform the box-in and rush and grab once Williamson was known to be present, no injury would have occurred to her. Williamson testified as to her previously diagnosed mental health worsening after

---

[65] Affidavit of John J. Bulger, ¶ 4, V. State Issued Vehicles, subpart D.
[66] Johnson v. McPhee, 147 Idaho 455, 466, 210 P.3d 563, 574 (Ct. App. 2009)

her shooting, and the physical manifestations it caused her.[67] Thus the elements for a cognizable negligent infliction of emotional distress are met, and summary judgment is improper.

As for intentional infliction of emotional distress, the following elements must be shown: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe.[68]

Defendants simply indicate that the shooting was not intentional, and therefore her claim must fail.  Defendants do not discuss recklessness. Plaintiff has certainly raised an issue of material fact whether the negligent planning and execution of the stop was reckless. The fact that the officers directed deadly force at Williamson without warning and when no danger presented itself to them or the public is sufficiently extreme and outrageous. "But for" these wrongful actions, Williamson's mental health would not have been further impacted. She testified that she is seeking treatment for the symptoms which have exacerbated her mental health problems. Summary judgment is not warranted.

### D. Defendants Olsen, Graham and Sellers ("Non-Shooters") Proximately caused Violations of Williamson's Fourth Amendment Right to Be Free from an unreasonable Seizure.

Defendants Olsen, Graham and Sellers contend that because their actions did not constitute "integral participation" in the constitutional violation, they cannot be held liable.  They misapprehend the basis of Plaintiff's complaint.  While they did not participate in the shooting of Williamson, they were "integrally participating" in the events that lead to her shooting, as set forth

---

[67] Statement of Facts, ¶ 59.
[68] Eldridge v. West, 458 P.3d 172, 178-79 (Idaho 2020)

above in Section C.  There is no dispute that all the officers assisted in the planned arrest of Chacon. Each officer drove to his assigned place, kept in communication, and continued with the planning even after it was known that Williamson had joined Chacon in his vehicle.  Their participation culminated in Williamson's seizure.

### E. Because Defendants Olsen, Graham and Sellers ("Non-Shooters") Caused the Fourth Amendment Violations, No "Failure to Intercede" Theory Is Needed.

These three Defendants contend that they cannot be held to liable for failing to intercede because they had no opportunity to do so.  The undisputed facts hold otherwise.

Olsen, along with Barnes, formulated the plan to apprehend Chacon.  Graham and Sellers were participants in the radio transmission that set forth the plan to box-in Chacon. They were dispatched to their positions and waited for events to unfold. When it was announced that Chacon had exited the house with a woman at his side, none of the officer voiced a concern about the planned arrest and the woman's wellbeing.  No one offered an alternative plan or recommended that the action terminate to ensure Williamson's safety.

It is disingenuous to argue that they had no opportunity to intervene when they were all in radio contact with each other and had ample time to express concern for the safety of the "unidentified woman."  Had they done so, the outcome of this event would likely have been greatly different.

### F. Defendants Olsen, Graham and Sellers ("Non-Shooters") Are Not Entitled to Qualified Immunity.

Defendants argue that they are entitled to qualified immunity.  This presumes that the Court concludes that Plaintiff's claims are properly rooted in the *Fourteenth Amendment.* For the reasons set forth in Section A, Plaintiff contests that assertion, and qualified immunity does not apply.

Williamson agrees with Defendants Olsen, Graham and Sellers that

> [i]f, viewing the alleged injuries in the light most favorable to the plaintiff, the court finds that a constitutional right appears to have been violated, it proceeds with the next step, which is to inquire whether the right was clearly established in light of the specific context of the case. If there is no clearly established law, then the officer is entitled to qualified immunity. If the law is clearly established, the court determines whether, in light of that law, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[69]

Defendants Olsen, Graham and Sellers' qualified immunity argument fails even under the *Fourth Amendment* if the alleged injuries are viewed in the light most favorable to Williamson. Without the slightest hint of any wrongdoing by Williamson, six undercover detectives in plain clothes driving unmarked vehicles stake out the house where Williamson was residing and, knowing she was a passenger in the car, willfully execute a predetermined plan to "box-in" the car and "rush and grab" the passenger with guns drawn causing her to be shot as she sat motionless in that car with her hands up. And when Defendants try to justify the shooting of Williamson by alleging that Defendant Edgley shot in self-defense after being struck by the car in which Williamson was a passenger, Defendants are failing to view Williamson's injuries in the light most favorable to her. Any reasonable officer would know that that the seizing and shooting of an innocent passenger riding in a car violates the *Fourth Amendment*.

Although Defendants Olsen, Graham and Sellers never fired their guns, their participation in the seizure of Williamson in violation of the *Fourth Amendment* proximately caused her injuries.

---

[69] *Summary Judgment Brief for Shooters,* pp 12-13 (citations omitted).

**G. When Attempting to Arrest Chacon, Defendants Olsen, Graham and Sellers ("Non-Shooters") Breached their Duties as Idaho State Police Officers to Williamson**

The undisputed fact clearly reflect that Defendants Olsen, Graham and Sellers were involved in the planning of the stop of Chacon and Williamson.  Although her presence was made know to them, none of them voiced any concern about the plan to box-in with unmarked vehicles and weapons drawn to effect a stop of the vehicle.  As set forth above in Section C above, Idaho recognizes the tort of negligent planning. *Kessler v. Barowsky*, 129 Idaho 640, 931 P.2d 634 (1996).  Plaintiff hereby incorporates all arguments set forth in Section C herein.

## CONCLUSION

For all the reasons stated above, Williamson respectfully asks this Court to deny all Defendants' motions for summary judgment.

DATED this 25<u>th</u> day of June, 2020.

<u>/s/ John J. Bulger</u>
JOHN J. BULGER
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of June, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Michael J. Kane
mkane@ktlaw.net and tpresler@ktlaw.net

Shane Reichert
shane@rlidaholaw.com and deanna@rlidaholaw.com

Stratton Laggis
stratton@rlidaholaw.com

John J. Bulger
bulger@hearnlawyers.com, teresa@hearnlawyers.com, deeann@hearnlawyers.com and leona@hearnlawyers.com

Richard A. Hearn
hearn@hearnlawyers.com

/s/ John J. Bulger
JOHN J. BULGER
Counsel for Plaintiff