## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

SHAYLEE WILLIAMSON,

      Plaintiff,

      v.

LEE EDGLEY, individually; BRADY
BARNES, individually; PAUL
GILBERT, individually; PAUL
OLSEN, individually; MARCUS
GRAHAM, individually; and TOM
SELLERS, individually,

      Defendants.

Case No. 4:19-cv-00099-BLW

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

Before the Court are Defendants, Lee Edgley, Brady Barnes, and Paul

Gilbert's (Shooting Defendants) (Dkt. 35), and Paul Olsen, Marcus Graham and

Tom Sellers' (Non-Shooting Defendants) (Dkt. 26) Motions for Summary

Judgment. The Court heard oral argument on August 20, 2020. After careful

consideration of the briefing and arguments, for the reasons that follow, the Court

will deny the motion for the Shooting Defendants and grant in part and deny in part

the motion for the Non-Shooting Defendants.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

## A.    Introduction

This case arises from Idaho State Police officers' attempt to arrest Rocco Chacon. Most of the facts are not in dispute. Rocco Chacon had an outstanding felony arrest warrant. When an ISP officer had previously attempted to arrest Chacon, he fled on foot. Officers learned of Chacon's whereabouts and the vehicle he was driving from someone they arrested. Based on that information, Sergeant Olsen located Chacon's vehicle and the residence he was staying at, and observed Chacon come out to his vehicle and return to the house. ISP officers quickly made a plan to apprehend Chacon when he drove away from the house. The plan was to box Chacon in and then execute a rush and grab – where officers would come out their vehicles with weapons drawn and use a show of force to subdue Chacon. For a variety of reasons, the box-in did not go as planned. Chacon exited the house with a then unknown female (later determined to be Shaylee Williams, the plaintiff in this matter). Chacon and the female got in the car and drove away from the house. All officers were aware Chacon was accompanied by a female passenger. When officers surrounded Chacon he did not comply with their commands to exit the vehicle. Instead he drove up on the sidewalk and fled. When Chacon's car started moving three of the six officers fired at Chacon, and his vehicle.

Williamson was struck by some of the bullets. Chacon was not hit.

There is a short period of time, however, where the facts are not only in dispute, but very unclear. Specifically, whether Detective Edgley jumped onto Chacon's hood, or was hit by Chacon. Whether the officers verbally identified themselves as "Police" before firing. And, how quickly Chacon pulled away from the scene.

### B.    Before the Shooting

In March 2017, Idaho State Police (ISP) Detectives Barnes and Edgley interviewed an individual who told them where Rocco Chacon was staying and described the car he was driving. Dkt. 45-3 at 5-8. Chacon had an outstanding felony arrest warrant and had eluded arrest by fleeing on foot from a traffic stop in February, 2017. *Id.* at 1-2. Detective Barnes relayed the information about Chacon to Sergeant Olsen and Olsen began surveillance of the residence where Chacon was believed to be. *Olsen Aff.* ¶¶ 4, 6, Dkt. 26-5. On March 17, 2017, Sergeant Olsen observed Chacon leave the residence, briefly enter a small white Honda Civic, and return to the residence. *Id.*

Sergeant Olsen and Detective Barnes quickly developed an informal plan to arrest Chacon over the radio. *Id.* at ¶ 8. Due to the immediacy of the situation and the potential mobility of Chacon, the usual Threat Assessment or Operations Plan

was not developed. *Id.* at ¶ 7-8. The plan to apprehend Chacon was broadcast by radio to Detectives Edgley, Gilbert, Graham, and Sellers. Dkt. 45-3 at 14.

The officers planned to "box-in" Chacon's car after he drove away from the residence using unmarked law enforcement vehicles. Dkt. 26-5 at ¶ 9. ISP detectives would then initiate a "rush and grab" maneuver where they would physically surround Chacon's vehicle with their weapons drawn, ordering Chacon out of the car. *Id.* Detective Barnes and Sergeant Olsen discussed the option of trying to arrest Chacon as he came out to the house, but rejected it. *Barnes Dep.* 19:14-22, Dkt. 45-3.

The officers planned that Detective Barnes would be in the lead car and would stop at the stop sign at the intersection of Golden Gate and Olympus. *Barnes Aff.* ¶ 10, Dkt. 35-4. Detective Graham would pull up to the left of Chacon's car, a parked car would be to the right, and Detective Edgley's car would be behind Chacon's car. Dkt. 45-3 at 16. Sergeant Olsen remained in the area performing surveillance. Dkt. 26-5 at ¶ 10. Sergeant Olsen directed Detective Sellers to set up a perimeter in case Chacon attempted to elude law enforcement again. *Sellers Aff.* ¶ 7, 12, Dkt. 26-6.

About 15 minutes after first observing Chacon, Sergeant Olsen observed Chacon exit the residence a second time with an unidentified adult female (later

identified as Williamson). Dkt. 26-5 at ¶ 9. Williamson was in a romantic

relationship with Chacon at the time. *Williamson Dep.* 11:7-9, Dkt. 35-3.

Williamson was experiencing heroin withdrawals that day and has limited memory

of the events that occurred, including her reasons for leaving the house. Dkt. 35-3

at 6, 11, 14. Both Chacon and Williamson got in the car and drove away from the

house.

Sergeant Olsen advised that Chacon and an unknown female were departing

the residence. Dkt. 35-4 ¶ 9. There was no discussion among the Defendants about

modifying or aborting the planned "box-in" and "rush and grab" apprehension of

Chacon when officer learned he was accompanied by the female. *Barnes Dep.*

21:21-22:5, Dkt. 45-4. Detective Barnes testified that the planned "box-in" and

"rush and grab" constituted a high-risk situation. *Id.* at 23:16-24.

When executing the plan to apprehend Chacon, Detective Edgley came to be

in the lead car and Barnes in the rear car. Dkt. 35-4 ¶ 11. Detective Edgley drove

an unmarked ISP issued Chevy pickup. Dkt. 35-5 at ¶ 4. Detective Edgley wore

plain clothes and an ISP issued soft body armor vest with police markings;

however, the vest was covered by a black jacket without visible law enforcement

markings. *Id.* Detective Edgley drove to the intersection of Golden Gate and

Olympus Drive with Chacon's car following. *Id.* at ¶10. Detective Edgley stopped

at the stop sign but parked his truck too far forward to use the vehicles parked on the street to block a potential escape route to the right side of Chacon's car, as was initially planned. *See* Dkt. 45-6 at 15. With Chacon's car behind him, Detective Edgley then left his truck and drew his weapon. Dkt. 35-5 at ¶ 10.

At the time Detective Edgley got out of his truck, Detective Barnes' vehicle was near the left rear of Chacon's car, and Detective Graham's vehicle was behind Chacon's car. *Id.* at ¶ 11. Detective Gilbert had parked on the opposite side of the street and was approaching the driver's side of Chacon's vehicle on foot. *Id.* All of the officers' vehicles were unmarked.

## C.     The Shooting

The following series of events took place over 10 to 15 seconds. *Gilbert Aff.* ¶ 17, Dkt. 35-6. This brief period may be best described as chaos, both in terms of actual events and the participants' recollections.

When Detective Edgley exited his vehicle he did not remove his jacket and had no visible markings that identified him as law enforcement, nor did he announce himself as such. *Edgley Dep.* 4:1-10, Dkt. 45-5. Detective Edgley stood directly in front of the driver's side of Chacon's car, about 6 to 8 inches from the bumper, and began shouting commands at Chacon to get out of the car, never acknowledging Williamson. Dkt. 35-5 at ¶ 12-13, 16; Dkt. 45-6 at 15. At the same

time Detective Edgley was approaching Chacon's car from the front, Detectives Gilbert and Barnes approached the driver's side yelling commands at Chacon to get out of the vehicle. *Graham Dep.* 19:13-19, Dkt. 45-5. Detective Barnes did not verbally identify himself as law enforcement, nor did he hear anyone else identify themselves as law enforcement.[1] *Barnes Dep.* 1:3-7, Dkt. 46-6; *Barnes Trial Testimony* 6:15-20, Dkt. 45-8.

Chacon's primary focus was on Detective Edgley. Dkt. 45-8 at 1. It was his belief that a robbery was occurring. *Id.* Williamson was only aware of Detective Edgley standing to the front left of the car and put her hands up when he approached with his gun drawn. Dkt. 45-4 at 25-26. Williamson did not hear any of the other detectives surrounding the car. Dkt. 45-5 at 3.

Chacon testified that, fearing for his and Williamson's lives, he let off the brake of his vehicle to allow his car to roll backwards.[2] Dkt. 45-1 at ¶ 36. While rolling backwards, Chacon angled his car to the right, then put the car in gear and

---

[1] In Barnes' testimony he states that he does not remember hearing any of the officers verbally identify themselves as police. However, in their affidavits Detective Edgley states that he identified himself as police, and believes Gilbert yelled "police." Dkt. 35-5 ¶ 15. Detective Gilbert states that he announced "Police, Hands up," several times. Dkt. 35-6 ¶ 12. Chacon testified at his trial that he never heard anyone identify themselves as police. Dkt. 35-3 at 35.

[2] Chacon's car had a manual transmission and was stopped facing slightly uphill, when he took his foot off the break the car was able to roll backward by the force of gravity.

turned his wheels to the right – away from where Detective Edgley was standing on the front left side –to move through the gap between Detective Edgley's truck and the parked car. *Barnes Dep.* 8:14-9:3, Dkt. 45-5.

When Chacon's car started pulling forward, Edgley states that the car hit him in the legs, he fell on the hood, made a conscious decision to fire through the windshield at Chacon, then rolled off the car onto the ground and from a sitting/lying position fired several more rounds as Chacon fled. Dkt. 35-5 ¶¶ 17, 18, 20; Dkt. 45-5 at 14. While Detective Edgley was in front of, or on the hood of, Chacon's car, he fired his weapon at Chacon an unknown number of times before rolling onto the ground. Dkt. 45-5 at 14. Most of the other officers on the scene agree that Chacon's car struck Edgley in the legs, throwing him onto the hood. Detective Graham could not see Edgley when he was on the hood of Chacon's car, but saw him get up off the ground after the car went across the sidewalk and start shooting from a standing position. Dkt. 45-5 at 17. Detective Gilbert saw Edgley get "ejected" from the hood of Chacon's car and come clear of the vehicle, but does not otherwise remember what happened to Edgley. Dkt. 45-6 at 11-12.

During Chacon's trial he testified that Detective Edgley "was running with my car or either lunged on it or jumped on it." *Chacon Trial Testimony*, Dkt. 35-3 at 35. At a later deposition, Chacon stated that Detective Edgley did not jump on

his car and was never on his car, but that "[h]is right hip or something went into my car." Dkt. 47-1 at 5. Additionally, Detective Graham did not see Edgley get hit by Chacon, and his testimony describes Detective Edgley as being on the move when Chacon's vehicle backed up and turned. Dkt. 45-6 at 14. There were at least two bullet holes through Chacon's windshield and the parties agree that no shots were fired until the car started moving. Dkt. 45-13 at 2.

Chacon had started driving forward prior to shots being fired, but when the shooting started Chacon ducked causing him to rev the engine. Dkt. 35-3 at 27. The actual speed at which Chacon and Williamson drove away is subject to dispute. Chacon testified that he hit the gas and the engine revved and then stalled when he got to the street. *Id.*; Dkt. 35-3 at 36. Detective Barns recalls the car accelerating quickly, "like, he, punched it." Dkt. 45-5 at 9. Detective Graham recalls that the vehicle "took off at a very high rate of speed" after the first shots were fired. Dkt. 45-6 at 5. However, Sergeant Olsen testified that Chacon's car was working up against the fence and "going slow," "one mile an hour." Dkt. 45-5 at 12-13.

As Chacon's car turned to the right, making contact with Detective Edgley, Detective Gilbert heard shots being fired and he fired into the left rear tire in an instinctive effort to disable the car. Dkt. 35-6 ¶ 15; Dkt. 45-6 at 10. As the car

proceeded forward Gilbert's position changed, relative to the car, placing him behind the vehicle. Dkt. 45-6 at 12. Detective Gilbert saw the back window of Chacon's car blow out and something went past his head. *Id.* Detective Gilbert continued to fire his weapon, believing Detective Edgley's life was in danger and someone in the car was shooting at him. Dkt. 35-6 ¶ 17. Detective Gilbert fired his weapon in the area he believed Chacon to be located. *Id.* Detective Gilbert fired an unknown number of additional shots at the car as it maneuvered to get around Defendant Edgley's vehicle and continued shooting after Detective Edgley had come off the hood. Dkt. 45-6 at 11-12. Detective Gilbert stopped shooting as Chacon's car went around Detective Edgley's vehicle. *Id.*

Detective Barnes fired one round at Chacon's car after he saw Detective Edgley come off the hood as the car drove around Detective Edgley's vehicle towards Olympus Drive. Dkt. 45-6 at 2.

Chacon's car made it around Detective Edgley's vehicle by driving up onto the sidewalk and moving alongside a wooden fence before taking out a stop sign along with a portion of the fence and continuing down the road. Dkt. 45-5 at 11.

Of the four Detectives surrounding the car, Detective Graham was the only one who did not discharge his weapon. Dkt. 45-6 at 13. Detective Graham did have his weapon drawn, but did not shoot because he felt that Detective Edgley was

possibly in his line of fire. Dkt. 26-4 ¶ 16.

Both Sergeant Olsen or Detective Sellers remained in their vehicles while the shooting was taking place, and did not fire their weapons. Dkt. 26-1 at ¶ 14, 20.

### D.    After the Shooting

Chacon was apprehended shortly after leaving the scene of the shooting. Dkt. 35-4 at ¶ 18-27. Once Chacon was placed in custody, Detective Barnes administered first aid to Williamson. Dkt. 35-4 at ¶ 27. Williamson was then admitted to Portneuf Medical Center in Pocatello, Idaho for "gunshot wounds to abdomen and left upper extremity." Dkt 45-2 at 23.

Detective Edgley was examined by a medical provider and was found to have suffered from contusions and bruising. Dkt. 35-5 at ¶ 23. He was placed on medical leave due to his injuries. *Id.* at ¶ 24.

Captain Fritz Zweigart conducted a third-level review of Detective Edgley's actions during the attempted arrest of Chacon. Dkt. 45-2 at 14-15. In the review, Captain Zweigart stated that "Detective Edgley put himself in a very dangerous and untactful position" and "[i]t is confusing to me how Detective Edgley got hit being in that position when the suspect was veering to the right to exit the scene and avoid Detective Edgley's vehicle." *Id.*

Detective Edgley was sanctioned with 16 hours of unpaid suspension for

failing to properly identify himself as a law enforcement during the attempted arrest of Chacon. Dkt. 45-7 at 7.

Chacon was charged with Battery with the Intent to Commit Murder Upon Certain Personnel, Aggravated Battery Upon Certain Personnel, and Aggravated Battery, among several other charges. *See* Dkt. 45-1 at ¶ 63. At Chacon's jury trial, the jury returned verdicts of "not guilty" on all three charges. *Id.*

On March 26, 2019, Williamson filed a complaint against the Shooting and Non-Shooting Defendants alleging violation of her Fourth Amendment rights under 42 U.S.C. § 1983 and violations of Idaho law. *Amd. Compl.*, Dkt. 7. Defendants now move for summary judgment on all of Williamson's claims. Dkt. 26, 35.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce

**MEMORANDUM DECISION AND ORDER - 13**

any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### A.    Shooting Defendants' Motion for Summary Judgment

Defendants Edgley, Barnes and Gilbert argue that, even though they fired their weapons, they should be entitled to summary judgment. Defendants argue that Williamson's § 1983 claim should be analyzed under the Fourteenth

Amendment, as that of an innocent bystander, instead of under the Fourth

Amendment's reasonableness standard. Defendants argue that summary judgment

is appropriate whether Williamson's claims are analyzed under the Fourth or

Fourteenth Amendment.

### 1. Williamson's Claim is Properly Raised Under the Fourth Amendment

The Ninth Circuit has not directly decided whether a passenger in a car

struck by a bullet, fired at the vehicle by police, may pursue an excessive force

claim under the Fourth Amendment, instead of a due process claim under the

Fourteenth Amendment. However, the majority of circuits that have reached the

issue have held that a passenger, in Williamson's position, may seek relief under

the Fourth Amendment. *Davenport v. Borough of Homestead*, 870 F.3d 273, 279

(3d Cir. 2017) (collecting cases). The circuits that have held otherwise reached

their decisions before *Brendlin v. California*, 551 U.S. 249 (2007) was decided.

*See id.*

"[T]here can be no question that apprehension by the use of deadly force is a

seizure subject to the reasonableness requirement of the Fourth Amendment."

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985). A person is "seized" under the Fourth

Amendment "when [an] officer, by means of physical force or show of authority,

terminates or restrains his freedom of movement, though means intentionally

applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted). Both the driver and passenger of a car are seized when police stop a car, and "an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act." *Id*. at 251, 254 (alterations and quotation marks omitted). The Supreme Court in *Brendlin* held that what matters in determining whether a seizure has occurred is the "intent [that] has been conveyed to the person confronted," not the "subjective intent" of the officer. *See Brendlin*, 551 U.S. at 260–61. In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Court held that the plaintiff was seized when the car he was driving crashed into a roadblock officers had set to stop him. *Id*. at 599. *Brendlin* explained that "if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock," rejecting the defendant's argument that "for a specific occupant of the car to be seized he must be the motivating target of an officer's show of authority." 551 U.S. at 261.

Likewise, in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), the Ninth Circuit held that a student was seized when officers fired pepperballs at a group of partygoers, striking the student in the eye. Although the officers made no further contact with the student – he fell to the ground, heard officers pass by him, and

then was transported to the hospital – the Court held that the officers' intentional act of firing pepperballs toward the crowd was sufficient "intentional governmental force" to constitute a seizure. *Id.* at 876. In *Nelson*, the Court contrasted intentional conduct with unintentional or accidental conduct of the officer. *Id.* "For an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." [3] *Id.*

Here, the officers intentionally stopped Chacon's car, in which Williamson was a passenger. The officers knew that Williamson was in the car with Chacon. Williamson put her hands up, demonstrating her understanding that she was not free to leave. When Chacon started driving forward the officers intentionally fired at the vehicle, striking Williamson.[4]

The officers stated that it was their intent to fire at Chacon, or Chacon's general location, however even taking this as true, the officers' subjective intent is irrelevant. *Id.* at 877 (citing *Brendlin*, 551 U.S. at 261). "The intent that counts

---

[3] The Court used the example of a police car accidentally pinning a fleeing felon when the brakes failed to describe an "unknowing and unintentional act." *Id.*

[4] Even if Williamson was not "seized" when the officers initially stopped and surrounded Chacon's car, she was "seized" when the officers shot her. *Nelson*, 685 F.3d at 875-76.

MEMORANDUM DECISION AND ORDER - 17

under the Fourth Amendment is the intent [that] has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." *Id.* (quoting *Brendlin*, 551 U.S. at 260–61).

The Court therefore finds that Williamson was seized and may pursue her claims against the officers under the Fourth Amendment. *Accord Villanueva v. California*, 2019 WL 1581392, at *6 (C.D. Cal. Jan. 31, 2019).[5]

### 2. Shooting Defendants Did Not Raise Qualified Immunity

As an initial matter, the shooting defendants did not argue that they are entitled to qualified immunity in their motion for summary judgment. Therefore, the Court finds that the argument is waived for purposes of summary judgment. *Pullano v. No. 8170, CCDC Guard*, 2013 WL 1758999, at *3 (D. Nev. Apr. 24, 2013); *accord Easley v. City of Riverside*, 765 F. App'x 282, 284 (9th Cir. 2019) (Graber, J., concurring). Defendants did plead qualified immunity as an affirmative defense in their answer, (Dkt. 9 ¶ 36), and may still raise it in a motion for judgment as a matter of law during the course of trial. *See Narducci v. Moore*, 572

---

[5] As noted in *Villanueva*, the cases cited by defendants, where the courts found that a passenger must pursue relief under the Fourteenth Amendment, do not discuss *Brendlin*. *Villanueva*, 2019 WL 1581392, at *6.

F.3d 313, 324 (7th Cir. 2009).

### 3.  Material Facts are in Dispute as to Williamson's Fourth Amendment Claim Against the Shooting Defendants.

A seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386, (1989). Whether an individual has been subjected to excessive force under the Fourth Amendment requires consideration of the reasonableness standard set forth in *Graham*. *See Nelson*, 685 F.3d at 878.

To determine whether officers used excessive force during an arrest, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Courts are to examine the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Yet, rather than mechanically marching through Graham's nonexhaustive list of factors, the Court should "examine the totality of the circumstances, including whatever factors may be relevant in a particular case." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174–75 (9th Cir. 2012)

"The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and

because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Thus, while "there are no per se rules in the Fourth Amendment excessive force context," *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013), an officer generally cannot use deadly force unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)).

Although on summary judgment the Court views the evidence in the light most favorable to Williamson, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This is an objective inquiry, and an officer's intentions have no bearing on whether he employed excessive force. *Id*. at 397.

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v.County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Court has]

held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012).

Here there are simply too many disputed facts to determine whether the officers use of force – firing at Chacon and Williamson – was reasonable. Most importantly, it is disputed whether Chacon posed a direct threat to Detective Edgley or the other officers. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (The single most important element in the *Graham* analysis is "whether the suspect poses an immediate threat to the safety of the officers or others."). The officers contend that Chacon hit Edgley with his car. However, Williamson, relying on Chacon's testimony, contends that Edgley either jumped on Chacon's car or ran alongside it and rolled to the ground. There is also a dispute as to how quickly Chacon accelerated away from the scene, and whether the officers ever verbally identified themselves as "police." Simply put, the facts during the relevant 15-second period of time, where Chacon began driving away and the officers fired at the vehicle, are sharply in dispute.

Since there is the potential that, viewing the facts in the light most favorable to Williamson, Chacon presented no threat to Detective Edgley or others in his low-speed escape, the facts could reasonably support a finding that the deadly

force used was objectively unreasonable. Therefore, the Court will deny the

shooting defendants' motion summary judgment as to Williamson's § 1983

excessive force claim.

### B.   Non-Shooting Defendants' Motion for Summary Judgment

Defendants Paul Olsen, Marcus Graham, and Tom Sellers argue that they

did not cause any violation of Williamson's constitutional rights, and therefore

cannot be liable.

To have a claim under § 1983, a plaintiff must show the existence of four

elements: "(1) a violation of rights protected by the Constitution or created by

federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting

under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a

method for vindicating federal rights elsewhere conferred.'" *Graham v. Conner*,

490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3

(1979)). A plaintiff must demonstrate that each defendant personally participated

in the deprivation of plaintiff's rights, *Jones v. Williams*, 297 F.3d 930, 934 (9th

Cir. 2002), or was an "integral participant" in the alleged constitutional violation,

*Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004).

"'[I]ntegral participation' does not require that each officer's actions

themselves rise to the level of a constitutional violation." *Boyd,* 374 F.3d at 780. However, "it does require some fundamental involvement in the conduct that allegedly caused the violation," *Id.*, and the officer must be more than a "mere bystander." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020).

The Ninth Circuit has yet to define the minimum level of involvement for liability under the integral-participation doctrine. *Reynaga Hernandez*, 969 F.3d at 942. In *Boyd*, the Ninth Circuit held that the armed officers who stood in the doorway of an apartment while another officer deployed a flashbang were integral participants in the use of excessive force, where the officers knew the flashbang would be used and had not objected. 374 F.3d at 780. In *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), the Ninth Circuit held that the officer who placed handcuffs on the suspect, allowing another officer to place hobble restraints on him – found to be an excessive use of force – was an integral participant. However, in *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009), the Ninth Circuit held that an officer who stood in the yard interviewing a witness and had not helped plan the unlawful search, was not an integral participant in the search.

Further, the Ninth Circuit has "not clarified whether [the court should] import both proximate cause and but-for cause into [the] integral-participant doctrine," suggesting that only but-for cause is required. *Reynaga Hernandez*, 969

F.3d at 942. But, the Ninth Circuit has described the standards of causation under tort law as being helpful in the integral participation analysis. *Id.* Tort law measures causation by reference to two standards: proximate and but-for cause. "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States*, 572 U.S. 434, 445 (2014). It precludes liability only "where the casual link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* But-for causation, instead, exists where the alleged injury or result would not have occurred "but for" that conduct. *White v. Roper,* 901 F.2d 1501, 1505–06 (9th Cir. 1990).

Williamson argues that the non-shooting officers were integral participants in the violation of her constitutional rights. Williamson states that "[e]ach officer drove to his assigned place, kept in communication, and continued with the planning even after it was known that Williamson had joined Chacon in his vehicle" culminating in Williamson's seizure. Dkt. 45 at 23. But, each officer did not drive to their assigned place based off the initial plan. The initial plan called for Detective Barnes to be the lead vehicle to stop at the stop sign in front of Chacon. In reality, when the plan was executed, Detective Edgley came to be the lead vehicle and parked too far forward, allowing Chacon an escape route. The plan

also called for the officers to subdue Chacon with an overwhelming show of force. However, Chacon did not submit to their show of force and instead fled. There was no plan to shoot Chacon or his passenger.

The officers all knew that Chacon had an outstanding felony arrest warrant and had probable cause to stop him. Stopping Chacon's vehicle with Williamson in the passenger seat would not, alone, arise to a constitutional violation. Instead Williamson's alleged constitutional violation is the shooting defendants use of excessive force. The decision to fire was first made by Edgley when Chacon's car started moving. The other officers fired after Edgley.

Olsen and Sellers were both in their cars when the officers were surrounding Chacon's car. Graham was standing behind Chacon's car on the passenger side, but never fired. None of these officers caused the shooting defendants to discharge their weapons. There was no time for them to either object or intercede. Simply put, the non-shooting defendants may have participated in the initial plan to stop Chacon, but they were bystanders to the subsequent use of force.

Williamson also argues that the non-shooting defendants should be liable on a failure to intercede theory. *See Cunningham v. Gates,* 229 F.3d 1271 (9th Cir. 2000). However, an officer can only be held liable for failing to intercede where they had an opportunity to intercede. *Id.* For the reasons stated above, the Court

finds that the officers did not have an opportunity to intercede. Therefore, the

Court will grant the non-shooting defendants' motion for summary judgment as to

Williamson's § 1983 claim.

### C.    State Law Claims

Williamson alleges that both the shooting and non-shooting defendants

breached a duty owed to her in violation of Idaho Law. Williamson argues that the

officers committed negligence in planning and execution by failing to complete a

threat assessment plan, not reassessing their plan to apprehend Chacon when

Williamson's presence became known, and by not identifying themselves as

officers and using only unmarked police vehicles. Williamson also argues that the

officers either negligently or intentionally inflicted emotional distress.

Defendants argue that they did not breach any duty to Williamson, and that

there is "no recognized duty to refrain from attempting to arrest a felon in a car

solely because another adult is a passenger." Defendants also argue that Chacon's

actions were an intervening cause that prevents a finding of negligence.

Negligence "requires the breach of a duty which is the proximate cause of

the plaintiff's injury." *Doe v. Durtschi*, 110 Idaho 466, 471 (1986) (citing

Restatement (Second) of Torts § 328A (1965)). The elements of common law

negligence claim are "(1) a duty, recognized by law, requiring the defendant to

conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Haight v. Idaho Dep't of Transportation*, 163 Idaho 383, 390–91 (2018). Claims of negligent actions of an individual employed by a governmental entity are "judged against that of an ordinarily prudent person acting under the same conditions and circumstances." *Miller v. Idaho State Police*, 150 Idaho 856, 871-872 (2011).

The Idaho Supreme Court, in *Kessler v. Barowsky*, 129 Idaho 647 (1997), described the duty related to planning and executing an arrest as follows:

> When making an arrest, a police officer must not subject the person being arrested to any more force or restraint than is necessary. *Anderson v. Foster*, 73 Idaho 340, 345 (1953). It necessarily follows that in planning an arrest, a police officer has the duty to plan to use no more force than is necessary.

*Id.* at 654. In *Kessler*, the Court was considering negligent planning, execution, and supervision claims in relation to plaintiff's wrongful death claim. There, the arrestee was a reserve sheriff deputy, accused of sexual assault, who had extensive martial arts training and who officers knew would be armed. *Id.* at 651. The Idaho Supreme Court reversed the lower court's grant of summary judgment for the defendant officers, finding that there were issues of material fact as to whether the plan called for excessive force.

Here, with regard to planning, the officers knew that Chacon had fled on foot when officers had previously tried to arrest him. They did not know if he was armed. They did not reassess their plan to use the "rush and grab" when they realized Williamson would be in the car. It is not clear from the record whether a threat assessment is required, or strongly suggested. Either way, the officers did not complete a threat assessment, even though they recognized that this was a high-risk situation. Ultimately, a reasonable person could conclude that the officers initial plan to use a "rush and grab" breached a duty to Williamson.

With regard to execution, it is not disputed that the officers were in unmarked vehicles and were not wearing uniforms. At least three of the officers had vests with the word "Police" on the front, but Edgley's jacket was covering his vest and he was in front of the car. It is disputed whether any of the officers verbally identified themselves as "police." Further, Edgley pulled too far forward allowing Chacon an escape route. Construing the evidence in a light most favorable to Williamson, a reasonable person could conclude that the officers were negligent in the execution of the arrest.

It was foreseeable that Chacon may try to flee, especially where the officers failed to identify themselves as police. Therefore, his actions are not an intervening cause.

**MEMORANDUM DECISION AND ORDER - 28**

With regard to the shooting officers, Williamson alleges they either intentionally or negligently inflicted emotion distress. The elements of an NIED claim are: 1) a legal duty recognized by law; 2) a breach of that duty; 3) a causal connection between the defendant's conduct and the plaintiff's injury; and, 4) actual loss or damage. *Frogley v. Meridian Joint School Dist. No. 2*, 155 Idaho 558 (2013). To establish an IIED claim Williamson must show: 1) the defendant's conduct was intentional or reckless; 2) the defendant's conduct was extreme and outrageous; 3) there was a causal connection between the defendant's wrongful conduct and the plaintiff's emotional distress; and 4) the emotional distress was severe. *Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172, 179 (2003).

Williamson meets the third and fourth prongs of both tests. As previously discussed, there are material facts in dispute as to whether the shooting defendants used excessive force in apprehending Chacon and Williamson, and the Court cannot find as a matter of law that the shooting defendants did not inflict emotional distress, either negligently or intentionally.

Accordingly, the Court will deny both motions for summary judgment as to the state law claims.

## ORDER

**IT IS ORDERED that:**

1. Shooting Defendants' Motion for Summary Judgment (Dkt. 35) is

   **DENIED**.

2. Non-Shooting Defendants' Motion for Summary Judgment (Dkt. 26) is

   **GRANTED in part** and **DENIED in part** as described above.

DATED: November 4, 2020

B. Lynn Winmill
U.S. District Court Judge